# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ANTONIO LARA-PANTOJA,<br><br>Defendant. | No. CR11-4053-DEO<br><br>**REPORT AND RECOMMENDATION** |

_____

This matter is before the court on the defendant's motions to suppress statements (Doc. No. 10) and to suppress a stop, search, and detention (Doc. No. 12). The government has filed a resistance (Doc. No. 18) to the motions. On July 7, 2011, the undersigned held a hearing on the motions. At the close of the hearing, the court invited further briefing, and the defendant filed a motion to dismiss the indictment on July 14, 2011 (Doc. Nos. 30-31). On July 25, 2011, the government filed a resistance to the defendant's motion (Doc. No. 36), and the motions are now fully submitted.

## BACKGROUND

On March 26, 2011, Officer Chad Dennler of the Denison Police Department stopped the defendant's vehicle for improper display of the rear license plate because the license plate bracket partially obscured the county and registration sticker. The police had been attempting to locate this vehicle because it had received a tip several days earlier that the vehicle was connected to narcotics activity.

When the defendant was asked for his driver's license, he was unable to produce one, but instead provided a Mexican identification card. Officer Dennler detected a strong odor of air freshener, and observed that the defendant had two cell phones, appeared extremely nervous, and had a large amount of money in his wallet. Officer Dennler had the defendant get out of the vehicle.

Officer Dennler asked the defendant if he could search him for weapons, and told him to place his hands on the hood of the patrol car. In response, the defendant turned to face the patrol car and placed his hands behind his back. Officer Dennler informed the defendant that he was not under arrest but he just wanted the defendant to place his hands on the patrol car. The defendant complied and was searched. The defendant asked several times if he could talk to his friend, who owned a Mexican grocery store nearby, but Officer Dennler told him "not at this time."

During the course of the stop, Officer Dennler discovered that the defendant's driving privileges in the state of Iowa had been suspended and that the defendant was not the registered owner of the vehicle. The defendant was arrested for driving with a suspended license, placed in the front seat of the patrol car, and transported from the scene of the traffic stop.

Officer Dennler then conducted an inventory search of the vehicle pursuant to Denison Police Department policy. He found a cell phone in the driver's door pocket and a wallet containing $3,076 in United States currency between the center console and driver's seat. Officer Girard of the Denison Police Department then arrived and took over the inventory search. He located approximately 3.75 grams of suspected methamphetamine in the center console. He then called Assistant Chief John Emswiler and advised him that they had stopped the vehicle that they had been looking for, that the

defendant was under arrest for driving with a suspended license, and that he had found narcotics and a large amount of money in the defendant's vehicle.

The defendant was taken to Crawford County Corrections, where Officer Dennler advised him of his *Miranda* rights with the assistance of a Spanish-speaking interpreter. The defendant stated he understood his rights, waived his right to an attorney, and agreed to speak to the officers. Using the Spanish-speaking interpreter, Officer Dennler and Assistant Chief Emswiler conducted the post-*Miranda* interview.

After the defendant made several admissions, Officer Dennler told him that he knew he was not being entirely truthful. He stated, "There are different things I can do, but you have to cooperate with me. I don't have to charge you with the drugs, but you got to do something for me. . . . I don't have to charge you with that [sic] drugs. It's up to me, basically, but you have to do something for me. I want more drugs than that."

The defendant asked how the police could "help him so that way he [could] help you guys." The officers told the defendant that he had to be honest with the police: "I can charge you with a felony or I can't . . . because, here's the deal, if I call immigration and I tell them I popped you with the dope and that money, the worst thing that's going to happen to you is you get deported. You're looking at federal prison if you don't cooperate. . . . [addressing the interpreter] We will not file a felony charge on him if he cooperates, and that's all we're going to promise him at this point, but he has to come up with something decent."

After the officers promised not to charge the defendant with a felony, he made a number of further admissions. He also said he might have about $50 worth of drugs, drug paraphernalia, and scales at his residence, and signed a document consenting to a search of his residence. He then was transported to his residence, accompanied by Assistant Chief Emswiler and the interpreter, to be present during the search. During the search,

officers located and seized $600 in $20 bills from a jacket belonging to the defendant, but no drugs or scales were located.

The defendant was then transported back to Corrections, where the officers told him that his cooperation up to that point would result in his being charged with misdemeanors and not a felony. The officers informed him that if he had been arrested on a felony, he could have faced up to 10 years in prison on a Class C felony; a misdemeanor would result in up to 6 months in jail. The defendant asked whether he would be deported after he served his time in jail; the officers stated that it would be "up to immigration." The defendant ultimately was charged in a criminal complaint in Crawford County District Court with possession of methamphetamine, a serious misdemeanor, and the misdemeanor offense of driving with a suspended driver's license.

On April 21, 2011, an indictment was filed in this court charging the defendant with conspiracy to distribute methamphetamine and possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(B)-(C).

The defendant contends that his detention was unlawful and equivalent to an arrest without probable cause. He further maintains that his vehicle was unlawfully searched. He also argues that his statements during interrogation were elicited in violation of his *Miranda* rights, and that his waiver of those rights were not knowingly, intelligently, or voluntarily made. Because of these violations of his rights, he asserts that his statements and all evidence seized should be suppressed.

## DISCUSSION

A.  **Stop and Detention of the Defendant**

A police officer "may stop and briefly detain a person for investigative purposes if the officer has reasonable suspicion supported by articulable facts that criminal activity

may be afoot. *United States v. Johnson*, 64 F.3d 1120, 1124 (8th Cir. 1995). Such detention, however, "must be temporary and last no longer than is necessary to effectuate a stop." *United States v. Willis*, 967 F.2d 1220, 1224 (8th Cir. 1992) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). The "investigative methods employed should be the least intrusive means reasonable available to verify or dispel the officer's suspicion in a short period of time." *Id*. "An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 129 S. Ct. 781, 788 (2009). Although there is no bright line of demarcation between investigative stops and arrests, a *de facto* arrest occurs when the officer's conduct is more intrusive than necessary for an investigative stop. *United States v. Bloomfield*, 40 F.3d 910, 916-17 (8th Cir. 1994). "A detention may become a *de facto* arrest if it lasts for an unreasonably long time, but there is no rigid time limit on an investigatory detention." *United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005). To determine whether a *de facto* arrest occurred, the court considers such factors as the duration of the stop, whether the suspect was handcuffed or confined in a police car, whether the suspect was transported or isolated, and "the degree of fear and humiliation that the police conduct engenders." *Bloomfield*, 40 F.3d at 917.

A vehicle may be stopped, and the driver detained by law enforcement, on the basis of probable cause that a traffic violation has occurred, no matter how minor. *Whren v. United States*, 517 U.S. 806, 812-13 (1996). In this case, the improper display of the license plate on the vehicle the defendant was driving provided a sufficient basis for the police to stop the vehicle. *See United States v. Stachowiak*, 521 F.3d 852, 855 (8th Cir. 2008) ("It is well established a minor traffic violation provides probable cause for a traffic

stop, even if it is mere pretext for a narcotics search."). In fact, the defendant conceded at the hearing that the vehicle stop was proper under *Whren*.

The defendant maintains that the stop became a *de facto* arrest when Officer Dennler (1) requested the defendant to place his hands on the patrol car so he could search the defendant; (2) denied the defendant's request to speak with his friend at the nearby grocery store; and (3) prolonged the detention on the basis of a subjective motive to investigate other matters. The defendant contends that Officer Dennler continued to question him without probable cause, without a warrant, and without advising him of his *Miranda* rights. The court disagrees. These minor restraints on the defendant's activities did not constitute an arrest. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6, 98 S. Ct. 330, 333 n.6 (1977) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."). "[T]he officer does not need to be certain that the suspect was armed. Rather, a pat-down is permissible if a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *United States v. Horton*, 611 F.3d 936, 941 (8th Cir. 2010) (internal quotation marks omitted). Furthermore, "[s]uspicious behavior by a passenger during a traffic stop may reasonably warrant a pat-down of the individual." *United States v. Davis*, 457 F.3d 817, 822 (8th Cir. 2006).

Here, the defendant appeared nervous, and the police had received information that the defendant's vehicle was involved in narcotics activity. The officer detected the scent of air freshener, and observed cash and two cell phones in the vehicle. The observations all suggested possible narcotics activity. Because narcotics often are connected to the presence of weapons, Officer Dennler did not exceed the scope of the investigatory stop by searching the defendant for weapons. *United States v. Robinson*, 119 F.3d 663, 667

(8th Cir. 1997) ("It is reasonable for an officer to believe that an individual may be armed and dangerous when that individual is suspected of being involved in a drug transaction because 'weapons and violence are frequently associated with drug transactions.'"). "[A] hypothetical officer in exactly the same circumstances reasonably could believe that the individual [was] armed and dangerous." *United States v. Hanlon*, 401 F.3d 926, 929 (8th Cir. 2005) (internal quotation marks omitted) (individual's nervousness supported officer's reasonable suspicion that individual was armed and dangerous).

The defendant's argument that the vehicle stop became a *de facto* arrest because Officer Dennler did not permit him to speak to his friend at a nearby grocery store is likewise without merit. "During a traffic stop, an officer may detain the occupants of the vehicle while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation." *United States v. Suitt*, 569 F.3d 867, 870 (8th Cir. 2009) (internal quotation marks omitted). "The officer . . . may detain a motorist while the officer completes certain routine tasks, such as writing a citation and completing computerized checks of a driver's license, vehicle registration, and criminal history." *United States v. Fuse*, 391 F.3d 924, 927 (8th Cir. 2004); *see United States v. Pulliam*, 265 F.3d 736, 740 (8th Cir. 2001) (reasonable investigation of traffic stop typically includes asking for license and registration, asking driver to sit in patrol car, and asking about destination and purpose of travel).

The defendant further maintains that no articulable facts provide a reasonable suspicion that he had been engaging in criminal activity to justify prolonging the stop, other than that the scent of air freshener in his vehicle, his nervous appearance, his possession of two cell phones, and a large amount of cash in his wallet. The court disagrees. Such circumstances can "give rise to suspicions unrelated to the traffic offense, [and] an officer may broaden his inquiry to satisfy those suspicions." *United States v.*

7

*Ward*, 484 F.3d 1059, 1062 (8th Cir. 2007) (air freshener in vehicle and defendant's nervousness can support suspicions of drug activity unrelated to traffic offense); *see United States v. Briasco*, 640 F.3d 857, 860 (8th Cir. 2011); *United States v. Santana*, 524 F.3d 851, 852 (8th Cir. 2008) (air freshener can signal presence of narcotics).

**B.    Search of the Defendant's Vehicle**

The defendant contends that the search of his vehicle did not comply with the vehicle impoundment and inventory policy of the Denison Police Department and was actually an illegal search incident to arrest contrary to *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710 (2009). The government argues that the officers' search of the vehicle was permissible as an inventory search. The search was conducted after defendant, the driver and sole occupant of the vehicle, was arrested. According to the government, the search was conducted pursuant to the Denison Police Department's standard impoundment/inventory policy. Drugs and cash were seized during the lawful inventory search because the incriminating nature and evidentiary value of the evidence was immediately apparent.

Searches outside the judicial process without the prior approval by a judge or magistrate are per se unreasonable under the Fourth Amendment subject only to a few specifically established and well delineated exceptions. *Gant*, 129 S. Ct. at 1716. "Under *Gant*, police may search the passenger compartment of a vehicle incident to arrest only if (1) the arrestee might have access to the vehicle at the time of the search, or (2) it is reasonable to believe the vehicle contains evidence of the offense of the arrest." *United States v. Hambrick*, 630 F.3d 742, 746 (8th Cir. 2011) (citing *Gant*, 129 S. Ct. at 1723). "In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence." *Gant*, 129 S. Ct. at 1719.

"Inventory searches are one of the well-defined exceptions to the warrant requirement of the Fourth Amendment." *United States v. Frasher*, 632 F.3d 450, 454 (8th Cir. 2011).

> The routine practice of securing and inventorying a vehicle's contents is a response to three distinct needs: the protection of the owner's property while it remains in police custody, the protection [of] the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger. The central question in evaluating the propriety of an inventory search is whether, in the totality of the circumstances, the search was reasonable. Inventory searches that are conducted according to standardized police procedures, which vitiate concerns of an investigatory motive or excessive discretion, are reasonable. Standardized police procedures are necessary to ensure that the search is not merely a ruse for general rummaging in order to discover incriminating evidence.

*Id*. (alteration in original) (internal quotation marks and citations omitted). "It is permissible for an officer to conduct an inventory search pursuant to department policy prior to a vehicle being towed, protecting both the vehicle owner and the officers." *United States v. Engler*, 521 F.3d 965, 971 (8th Cir. 2008). "An officer's testimony that the inventory search was performed within the police department's policy is sufficient." *Id*. at 972.

The Denison Police Department's written vehicle impoundment and inventory policy provides that "[a]n 'inventory' is an administrative process by which items of property in a seized vehicle are listed and secured. An inventory will not be used as a substitute for a search." Gov't Ex. 2; Doc. No. 18-2, Ex. 2, § II.2. A motor vehicle will be impounded and inventoried when, among other things, the driver is subsequently placed under arrest for violation of any criminal or motor vehicle law. *Id*. § III.1. All impounded vehicles are inventoried at the time of impoundment using the prescribed departmental form. *Id*. § IV.1. An inventory includes the entire vehicle, including all

9

compartments and/or containers, open or closed. *Id.* § IV.4. In the event of a locked compartment or container, an inventory will be conducted of them only if they can be opened without damage. *Id.*

The defendant maintains that the vehicle search in this case did not comply with the police department's policy because the officers searched his vehicle at the location of arrest, immediately after he was arrested and secured in the patrol car, contrary to the inventory policy stating that an officer who seizes a vehicle as a "seizure for forfeiture" (Doc. No. 18-2, Ex. 2 § V) or as a "seizure of evidence" (*id.* § VI) shall completely inventory the vehicle's contents immediately upon its arrival at a storage facility.[1] The defendant's argument is not persuasive. Sections V and VI of the policy concern seizures for forfeiture or as evidence, and do not apply here, because the defendant's vehicle was impounded upon his arrest for driving with a suspended license pursuant to section III. A vehicle that is impounded when its driver has been arrested is to be "inventoried at the time the vehicle is impounded." *Id.* § IV.1. The officers did not violate department policies. The defendant's motion to suppress the search of his vehicle accordingly should be **denied**.

## C. The Defendant's Post-*Miranda* Statements

The defendant maintains that his waiver of his *Miranda* rights was invalid because he was coerced into doing so by threats of federal prosecution, a more lengthy jail

---

[1] Section V of the policy provides that when a vehicle has been seized because it has been used illegally such as, among other things, in the commission of a felony, the vehicle is classified as a "seizure for forfeiture." Doc. No. 18-2, Ex. 2 § V. "An officer who seizes a vehicle for forfeiture shall completely inventory the contents immediately upon [its] arrival at the storage facility." *Id.* § V.4.

Section VI of the policy likewise provides that when a vehicle has been seized as evidence because it has been stolen or used in a crime or is otherwise connected with a crime, "[a] vehicle seized as evidence shall be completely inventoried as soon as practicable after [its] arrival at a storage facility." *Id.* § VI.4.

sentence, and deportation. He further claims his waiver was invalid because he was induced to waive his rights by false promises of leniency.

Generally, statements by a defendant after being advised of his *Miranda* rights are admissible as evidence. The test for determining the voluntariness of a confession is whether the confession was extracted by threats, violence, or direct or implied promises such that the defendant's will was overborne and his capacity for self-determination critically impaired. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. Boslau*, 632 F.3d 422, 428-29 (8th Cir. 2011). The court discerns "whether a confession is voluntary under the totality of the circumstances, examining both the conduct of the officers and the characteristics of the accused." *Id*. The court considers, "among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *Id*.

> The mere fact that an officer may have elicited a confession through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices, does not render a confession involuntary *unless the overall impact of the interrogation caused the defendant's will to be overborne*.

*Id*. at 428-29 (emphasis added). "The government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary." *Id*. at 429. The promise of leniency in not filing certain charges associated with a traffic stop is not enough by itself to make a defendant's statements involuntary. *United States v. Otters*, 197 F.3d 316, 317 (8th Cir. 1999).

11

The defendant in *United States v. Lall*, 607 F.3d 1277 (11th Cir. 2010), was convicted on federal offenses of conspiracy to commit credit card fraud, possession of device-making equipment with intent to defraud, and aggravated identity theft. The court in *Lall* found that the defendant's confession to a North Miami Police detective was not voluntary because the detective's representation to the defendant that the information he provided would not be used against him by the police or anyone else was sufficient to render the defendant's confession involuntary because it undermined the prophylactic effect of the *Miranda* warnings previously administered to the defendant. *Id*. at 1287. The court further held that an involuntary confession is inadmissible in a federal prosecution even if it was improperly coerced by state law enforcement officers. *Id*. The court recognized that misrepresentations of fact "are not enough to render a suspect's ensuing confession involuntary, nor does it [sic] undermine the waiver of the defendant's *Miranda* rights. *Id*. at 1285. "Police misrepresentations of law, on the other hand, are much more likely to render a suspect's confession involuntary." *Id*.

> [T]hrough promises of non-prosecution, "the government has made it impossible for the defendant to make a *rational* choice as to whether to confess–has made it in other words impossible for him to weigh the pros and cons of confessing and go with the balance as it appears at the time." Thus, "if the government feeds the defendant false information that seriously distorts his choice . . . then the confession must go out."

*Id*. at 1286 (second alteration in original) (internal citation omitted) (quoting *United States v. Rutledge*, 900 F.2d 1127, 1129 (7th Cir. 1990)). The court found that the detective's promise to the defendant was deceptive because it was inconceivable that the defendant, "an uncounseled twenty-year-old, understood at the time that a promise by [the detective] that he was not going to pursue any charges did not preclude the use of the confession in a federal prosecution." *Id*. at 1287. "Indeed, it is utterly unreasonable to expect any

uncounseled layperson, especially someone in [the defendant's] position, to so parse [the detective's] words." *Id.*

This court finds that the defendant's will was overborne, and his capacity for self-determination was critically impaired, when the officers told him that if he did not cooperate he would go to federal prison, and that if he did cooperate, he would not be charged with a felony. It is not reasonable to believe the defendant understood that, despite these assurances, if he cooperated, he still could be charged with a felony in federal court. This is especially true since the police told the defendant during his interrogation that if he did not cooperate, he would be "looking at federal prison." The implication of this ultimatum is that if the defendant did cooperate, then he would not face federal prosecution. In these circumstances, it is not likely that the defendant could have any understanding other than that if he cooperated with the police, which he did, he would not be charged with a felony, which includes prosecution in federal court.

The present case is unlike cases where the police inform a defendant in a noncoercive manner of the realistically expected penalties and encourage him to tell the truth, which affords him the chance to make an informed decision with respect to his cooperation with the government. *Cf. United States v. Santos-Garcia*, 313 F.3d 1073, 1079 (8th Cir. 2002). Rather, in this case the police officers effectively coerced the defendant to choose between incriminating himself by cooperating with the police or being charged with a felony. Because state law enforcement officers improperly coerced the defendant's post-*Miranda* statements, such statements are inadmissible in this case. *See Lall*, 607 F.3d at 1287 (holding that involuntary confession is inadmissible in federal prosecution even if it was improperly coerced by state law enforcement officers). Accordingly, the defendant's motion to suppress statements (Doc. No. 10) should be **granted**, but only as to statements made after the promises of no felony prosecutions,

which occur at 21:04:20 of the recording. All of the defendant's statements before these promises are admissible.

**D.     The Defendant's Motion to Dismiss the Indictment Based on Immunity**

Relying on *Lall*, the defendant further argues that the indictment should be dismissed because his due process rights under the Fifth and Fourteenth Amendments have been violated. Doc. No. 31 at 5. The court disagrees. While *Lall* supports suppression of the defendant's post-*Miranda* statements because they were not voluntarily, the case does not support the dismissal of the indictment. The court can find no other authority to support such a result. The defendant's motion to dismiss the indictment (Doc. No. 30) should be **denied**.

## RECOMMENDATION

For the reasons stated above, IT IS RESPECTFULLY RECOMMENDED that the defendant's motion to suppress statements (Doc. No. 10) should be **granted in part and denied in part** consistent with this report, and the defendant's motions to suppress a stop, search, and detention (Doc. No. 12) and to dismiss the indictment (Doc. No. 30) should be **denied**. The government's request for an evidentiary hearing (Doc. No. 36) was **granted**, and the hearing was held. Objections to this Report and Recommendation must be filed by **August 10, 2011**. Responses to objections must be filed by **August 17, 2011**.

**IMPORTANT NOTE:** Any party planning to lodge any objection to this Report and Recommendation must order a transcript of the hearing promptly, but no later than **August 3, 2011**, <u>regardless of whether the party believes a transcript is necessary to argue the objection</u>. If an attorney files an objection without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 2nd day of August, 2011.

_____
PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT